## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| LISHAN WANG,<br>    *Plaintiff*,<br><br>    v.<br><br>MIRIAM DELPHIN-RITTMON *et al.*,<br>    *Defendants*. | No. 3:17-cv-586 (JAM) |

### ORDER DENYING DEFENDANTS' MOTION TO DISMISS

Plaintiff Lishan Wang alleges that while he was a pretrial detainee at Whiting Forensic Hospital he was forcibly injected with Benadryl and put into four-point restraints for upwards of ten hours in violation of his constitutional rights. The Court has previously issued an initial review order allowing his claims to proceed against two doctor defendants (Dr. Diana Kurlyandchik, and Dr. Victoria Dreisbach) as well as four nurse defendants (Clara Mejias, Judy Hall, Heather Madison, Misty Delciampo).

The defendants have now moved to dismiss, arguing that the suit is barred by the *Rooker-Feldman* doctrine, that they are entitled to quasi-judicial immunity, and that they are entitled to qualified immunity. I will deny their motion.

### BACKGROUND

As an initial matter, I take judicial notice of state court rulings and orders that set forth the background facts leading up to the events at issue on February 22, 2017 that are the focus of Wang's complaint against the defendants.[1] Wang was charged with murder and other crimes in Connecticut state court in 2010. Following protracted pre-trial proceedings, a state court found

---

[1] These sources include the state trial court order allowing for the forcible medication of Wang to stand trial and the ruling of the Connecticut Supreme Court affirming the state court order. *See* Doc. #168-3; *State v. Wang*, 323 Conn. 115 (2016). Wang's complaint likewise refers to some of the events and proceedings leading up to the incident of February 22, 2017. Doc. #139 at 5-6 (¶¶ 13-14).

Wang not competent to stand trial. The state court then conducted several hearings from September to November 2015 for the purpose of determining whether Wang should be subject to involuntary medical treatment to restore his competency.

Connecticut law allows a state court to enter an order for the involuntary administration of antipsychotic drugs that may restore a criminal defendant to competency for trial. *See* Conn. Gen. Stat. § 54-56d. In particular, the law provides that "the court may order the involuntary medication of the defendant if the court finds by clear and convincing evidence that: (A) To a reasonable degree of medical certainty, involuntary medication of the defendant will render the defendant competent to stand trial, (B) an adjudication of guilt or innocence cannot be had using less intrusive means, (C) the proposed treatment plan is narrowly tailored to minimize intrusion on the defendant's liberty and privacy interests, (D) the proposed drug regimen will not cause an unnecessary risk to the defendant's health, and (E) the seriousness of the alleged crime is such that the criminal law enforcement interest of the state in fairly and accurately determining the defendant's guilt or innocence overrides the defendant's interest in self-determination." § 54-56d(k)(2).

On January 21, 2016, the state trial court ruled that the State's proposed treatment plan met all these statutory requirements and also satisfied the similar constitutional due process requirements as set forth in *Sell v. United States*, 539 U.S. 166 (2003).[2] Wang appealed this ruling, and the Connecticut Supreme Court affirmed the state court order on September 13, 2016. *See State v. Wang*, 323 Conn. 115 (2016).[3]

---

[2] Doc. #168-3 at 4-7.
[3] Unless otherwise indicated, this ruling omits internal quotation marks, alterations, citations, and footnotes in text quoted from court decisions.

The state court order refers to "the two specific medications recommended for the treatment of the defendant," and the Connecticut Supreme Court's ruling makes clear that these two medications were Olanzapine and Ziprasidone as testified to and recommended by the State's psychiatrist—Dr. Mark Cotterell—and with the unanimous support of Wang's treatment team.[4] There is nothing in the state court order or the Connecticut Supreme Court's ruling that purports to authorize the involuntary administration of any medication other than Olanzapine and Ziprasidone or that describes the manner in which the State could effectuate its authority to involuntarily administer Olanzapine and Ziprasidone.

That brings us to the events of February 22, 2017. According to the complaint, Wang was called on that day around 2:30pm to Building Unit 2 at the Whiting Forensic Institute to receive his court-ordered medication.[5] When Wang emerged from his dorm, he told the male employees assembled in the hallway that "You all know I do not need medication."[6] When he was asked to go to the treatment room, Wang refused, telling the officers "You need to carry me over there."[7] At that point, some of the assembled employees grabbed Wang's "arms, legs, and other parts of his body."[8] In response Wang "stiffed his body" but at no point "pushed, kicked, grabbed, scratched, or hit anyone."[9]

The employees carried Wang into the restraint room and strapped him to a bed in a four-point restraint.[10] At around 2:45pm, one of the defendant nurses—Heather Madison—injected Wang with his first dose of what Wang refers to as Zyprexa (the brand name for Olanzapine).[11]

---

[4] Doc. #168-3 at 5, 6; *Wang*, 323 Conn. at 122.
[5] Doc. #139 at 6 (¶ 16).
[6] *Ibid.*
[7] *Ibid.*
[8] *Ibid.*
[9] *Id.* at 7 (¶ 16).
[10] *Ibid.*
[11] *Ibid.*

During the injection, Wang twisted his hips to try and avoid the needle, and male employees grabbed his legs, thighs, and hips to stabilize him for injection.[12]

At 4:00pm one of the defendant doctors—Dr. Diana Kurlyandchik—appeared.[13] He told her: "'I don't need med.' 'You need medication.' 'I'm going to sue you.' 'I've Chinese government behind me.' 'You crazy.' etc.'"[14] Dr. Kurlyandchik returned at 4:30pm and spoke with Wang again. During one of her conversations with him, she told him that, if he said "I will not harm anyone," then she would terminate his four-point restraint.[15] Wang was silent because he had "never wanted to harm anyone physically" and he felt that the request "was a trap because it would indicate that he had wanted to harm others."[16]

Dr. Kurlyandchik ordered continuous four-point restraint for Wang after 4:30pm.[17] One of the nurse defendants—Misty Delciampo—falsely accused Wang of being "violent and threatening," and she recommended continued use of four-point restraints.[18]

The second-shift psychiatrist was another doctor defendant—Dr. Victoria Dreisbach.[19] She prescribed for Wang two doses of Benadryl—a medication that was *not* the subject of the state court's order of involuntary medication.[20] The first dose of Benadryl was injected by defendant nurse Clara Mejias, and the second dose by defendant nurse Judy Hall.[21] Both doses were administered to Wang against his will while he was in four-point restraints and despite the

---

[12] *Ibid.*
[13] *Id.* at 8 (¶ 17).
[14] *Ibid.*
[15] *Ibid.*
[16] *Ibid.*
[17] *Id.* at 12 (¶ 25).
[18] *Id.* at 13 (¶ 27).
[19] *Id.* at 8-9 (¶ 19).
[20] *Ibid.*
[21] *Ibid.*

fact that Dr. Dreisbach and nurses Mejias and Hall knew that there was no court order to allow them to forcibly administer Benadryl.[22]

The complaint does not say when the first dose of Benadryl was administered but states that the second dose was administered about eight hours after he had first been placed in four-point restraints (somewhere between 2:30pm to 2:45pm) and within a short period of time from the first Benadryl dose.[23] At 9:10pm Wang was also injected with a second dose of Zyprexa (Olanzapine) while still in four-point restraints.[24]

When Wang asked nurse Mejias why he was being given Benadryl for the first dose, she told him that Dr. Dreisbach had ordered it. When Wang sought clarification from nurse Hall for the second dose, she explained that Dr. Dreisbach had prescribed Benadryl "for the side effects."[25] But, according to Wang, he did not have any side effects from the Zyprexa (Olanzapine).[26]

Finally around midnight, after Wang had been in four-point restraints for about ten hours, he was released to go to the bathroom.[27] When Wang finished using the bathroom, he "passed out, lost his consciousness, and . . . collapsed to the floor in the bathroom."[28] As he fell, Wang hit his nose on the urinal, fracturing his nasal bone, and he was taken to an outside medical hospital for treatment.[29] According to Wang, he fell because of the dizzying side effects of the Benadryl.[30]

---

[22] *Id.* at 9 (¶ 20).
[23] *Id.* at 9 (¶¶ 19, 20).
[24] *Id.* at 7 (¶ 16).
[25] *Id.* at 8-9 (¶ 19).
[26] *Ibid.*
[27] *Id.* at 9-10 (¶ 21).
[28] *Id.* at 10 (¶ 22).
[29] *Id.* at 10-11 (¶¶ 22-23).
[30] *Id.* at 9-10 (¶ 21).

Wang's complaint describes how being in four-point restraint was "extremely uncomfortable, painful, agonizing, dreary, stressful, traumatic, [and] injurious both mentally and physically."[31] "He twisted or bended his body because of the pain and distress, but being 4-point restrained he could NOT change his body position."[32] "The pain and agony became more and more intolerable as the hour[s] of 4-point restraint extended."[33]

Wang alleges that he "had NEVER been violent physically or threatened to harm anyone physically."[34] He further alleges that "[t]here was no sign or symptom which could raise a concern about the risk of his posing harm to himself or others."[35]

According to Wang, most of the defendants wrote lies in their medical reports claiming that he had acted threateningly and violently. Dr. Kurlyandchik "fabricated that she had attempted to talk to Mr. Wang (who refused) before the 4-point restraint, and had further fabricated that Mr. Wang had threatened to do physical harms to others."[36] Similarly, Dr. Dreisbach "lied against Mr. Wang by falsely alleg[ing] that Mr. Wang was violent on 2/22/2017 and he was trying to break out under 4-point restraint."[37] Three of the four nurse defendants— Delciampo, Mejias, and Madison—lied in the medical records by claiming that he acted violently.[38] Wang does not claim that the fourth nurse defendant—Hall—made false entries in her records or falsely accused him of being threatening or violent.[39]

---

[31] *Id.* at 15 (¶ 32).
[32] *Ibid.*
[33] *Ibid.*
[34] *Id.* at 8 (¶ 16).
[35] *Ibid.*
[36] *Id.* at 11 (¶ 24); *see also id.* at 17-18 (¶ 35) (quoting alleged false statements by Dr. Kurlyandchik).
[37] *Id.* at 12 (¶ 26); *see also id.* at 19 (¶ 36) (quoting alleged false statements by Dr. Dreisbach).
[38] *Id.* at 12-14 (¶¶ 27-29).
[39] *Id.* at 14, 16-17 (¶¶ 30, 33-34).

About two weeks later, Wang met with Dr. Cotterell and members of his treatment team on March 8, 2017. At that meeting, Dr. Cotterell confirmed that without a court order no doctor or nurse could administer any non-court-approved medicine to Wang.[40]

Wang filed this lawsuit in April 2017.[41] After a series of amended complaints, he filed the operative complaint on September 14, 2021.[42] In its initial review order of the operative complaint, the Court allowed two of Wang's Fourteenth Amendment claims to proceed: (1) the claim against Dr. Dreisbach and nurses Mejias and Hall in their individual capacities for violating Wang's right to substantive due process when they ordered and administered two injections of Benadryl without authorization and without Wang's informed consent; and 2) the claim against Drs. Kurlyandchik and Dreisbach and nurses Mejias, Madison, and Delciampo in their individual capacities for violating Wang's due process rights when they continued by means of excessive force to confine him in four-point restraints for upwards of ten hours even though he was not engaging in violent or threatening conduct.[43] The Court dismissed all other claims and defendants.

The remaining defendants have filed a motion to dismiss on three grounds.[44] First, they move to dismiss pursuant to Fed. R. Civ. P. 12(b)(1) on the ground that the Court lacks subject matter jurisdiction because of the *Rooker-Feldman* doctrine. Second, they move to dismiss pursuant to Fed. R. Civ. P. 12(b)(1) on the ground that the complaint fails to state a claim for relief because the defendants are entitled to quasi-judicial immunity. Third, they move to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) on the ground of qualified immunity.[45]

---

[40] *Id.* at 6 (¶ 15).
[41] Doc. #1.
[42] Doc. #139.
[43] Doc. #140.
[44] Doc. #168.
[45] Doc. #168-1.

DISCUSSION

The standard that governs a motion to dismiss under Rules 12(b)(1) and 12(b)(6) is well established. Under Rule 12(b)(1), a complaint may not survive unless it alleges facts that, taken as true, give rise to plausible grounds to sustain federal subject matter jurisdiction. *See Lapaglia v. Transamerica Cas. Ins. Co.*, 155 F. Supp. 3d 153, 155–56 (D. Conn. 2016). Similarly, under Rule 12(b)(6), a complaint may not survive unless it alleges facts that, taken as true, give rise to plausible grounds for relief on the merits. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

The Court must read the allegations of a *pro se* complaint liberally to raise the strongest arguments that they suggest. *See Meadows v. United Servs., Inc.*, 963 F.3d 240, 243 (2d Cir. 2020) (*per curiam*). Still, notwithstanding the rule of liberal interpretation of a *pro se* complaint, a complaint may not survive dismissal if its factual allegations do not meet the basic plausibility standard. *See ibid.*

### Rooker-Feldman doctrine

The defendants first argue that the complaint must be dismissed pursuant to Fed. R. Civ. P. 12(b)(1) because there is no federal jurisdiction under the *Rooker-Feldman* doctrine. The *Rooker-Feldman* doctrine jurisdictionally bars the federal courts from hearing "cases that function as *de facto* appeals of state-court judgments." *Sung Cho v. City of New York*, 910 F.3d 639, 644 (2d Cir. 2018). There are four requirements that must be met in order for the *Rooker-Feldman* doctrine to bar a plaintiff's claim: "(1) the federal-court plaintiff must have lost in state court; (2) the plaintiff must complain of injuries caused by a state-court judgment; (3) the plaintiff must invite district court review and rejection of that judgment; and (4) the state-court judgment must have been rendered before the district court proceedings commenced." *Id.* at 645.

The problem for the defendants' *Rooker-Feldman* argument is obvious. Wang's amended complaint does not seek to hold the defendants liable for taking measures that were authorized by the state court order.[46] To the contrary, he seeks to hold them liable for taking measures—including the forcible injection of Benadryl and the prolonged use of four-point restraints—that were *not* mentioned or expressly authorized by any terms of the state court order.

The defendants do not appear to dispute this. So there appears to be no basis for the defendants to suggest that the state court authorized the defendants to forcibly administer Benadryl to Wang or to subject him to ten hours of detention in four-point restraints. As Wang rightly points out, "[t]he court order is a narrow and specific permission, NOT a blank check!"[47]

Therefore, as to the involuntary administration of Benadryl and prolonged use of four-point restraints, the defendants cannot possibly satisfy the second or third prongs of *Rooker-Feldman—i.e.*, that Wang "complain[s] of injuries caused by a state-court judgment" or that Wang "invite[s] district court review and rejection of that judgment."

Just because the defendants' actions are related to and occurred soon after issuance of the state court order does not mean that they are within the scope of the *Rooker-Feldman* doctrine. As the Second Circuit has made clear, the *Rooker-Feldman* doctrine does not apply to claims of injury that have been caused "not by the judgment" of the state court but merely by a defendant's actions "following upon" a state court judgment. *Dorce v. City of New York*, 2 F.4th 82, 105 (2d Cir. 2021). Accordingly, I will deny the defendants' motion to dismiss to the extent that it seeks dismissal for lack of jurisdiction under the *Rooker-Feldman* doctrine.

---

[46] Doc. #139 at 21. The defendants are well aware of this because the Court has previously entered an order restricting the scope of claims that Wang may plead in his amended complaint. Doc. #124 at 16-17.
[47] Doc #179 at 3.

### *Quasi-judicial immunity*

The defendants next move to dismiss on the grounds that they have quasi-judicial immunity. They argue that quasi-judicial immunity is a derivative form of absolute judicial immunity and that they "properly executed the Forcible Medication Order, a step integral to the state court's judicial process, entitling them to absolute, quasi-judicial immunity from suit for those acts and depriving this Court of subject matter jurisdiction."[48]

As an initial matter, the defendants claim—but without citing any authority—that a defense of quasi-judicial immunity goes to the Court's subject matter jurisdiction and may be challenged under Rule 12(b)(1) rather than under Rule 12(b)(6).[49] This distinction is an important one because when a court evaluates a motion to dismiss under Rule 12(b)(6) it must accept the non-conclusory fact allegations of the complaint as true and draw all reasonable inferences in favor of the plaintiff. *See Costabile v. New York City Health & Hosps. Corp.*, 951 F.3d 77, 80 (2d Cir. 2020) (*per curiam*). Where, as here, the plaintiff is a *pro se* party, a court must also give a liberal construction to the plaintiff's allegations. *Ibid.* And the court in the context of a Rule 12(b)(6) motion may only consider documents that a plaintiff has chosen to attach to the complaint, that are incorporated by reference in the complaint, or that are otherwise integral to the allegations of the complaint if there is no dispute about the authenticity or accuracy of the document. *See United States ex rel. Foreman v. AECOM*, 19 F.4th 85, 106 (2d Cir. 2021).

By contrast, when a court evaluates a motion to dismiss under Rule 12(b)(1), it may—and sometimes *must*—consider extrinsic evidence such as affidavits that contradict the allegations of the complaint in order to determine whether there is federal subject matter jurisdiction. As the

---

[48] Doc. #168-1 at 8.
[49] *Id.* at 8, 12 n.7.

Second Circuit has recently ruled, "district courts have broad discretion when determining how to consider challenges to subject matter jurisdiction" under Rule 12(b)(1) and that "[w]here a party offers extrinsic evidence that contradicts the material allegations of the complaint, we have suggested that it would be error for the district court to disregard that extrinsic evidence." *Harty v. W. Point Realty, Inc.*, 28 F.4th 435, 442 (2d Cir. 2022). In sum, "under Rule 12(b)(1), we are permitted to rely on non-conclusory, non-hearsay statements outside the pleadings, . . . which we cannot consider under Rule 12(b)(6) unless they are incorporated within or integral to the complaint." *M.E.S., Inc. v. Snell*, 712 F.3d 666, 671 (2d Cir. 2013).

Moreover, if a defendant submits evidence to show a fact dispute about whether there is federal jurisdiction pursuant to Rule 12(b)(1), then a plaintiff may not merely rest on the allegations of the complaint as one may do to defend against a Rule 12(b)(6) motion. Instead, "the plaintiffs will need to come forward with evidence of their own to controvert that presented by the defendant if the affidavits submitted on a 12(b)(1) motion reveal the existence of factual problems in the assertion of jurisdiction." *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 57 (2d Cir. 2016) (internal quotation marks and ellipses omitted).

So there is a world of difference between what a court may consider when addressing a Rule 12(b)(1) motion versus a Rule 12(b)(6) motion. And the defendants hope to exploit this difference by submitting and relying on a highly detailed affidavit of Dr. Dreisbach that fundamentally contradicts Wang's allegations and that justifies the use of Benadryl and four-point restraints. The defendants say that "[b]ecause quasi-judicial immunity deprives the court of subject matter jurisdiction, the motion to dismiss on this ground is brought pursuant to Fed. R.

Civ. P. 12(b)(1). As such, this court may consider evidence outside of the four corners of the complaint, including the affidavit supplied by Defendant Dr. Dreisbach."[50]

But the defendants are plainly wrong. A defense of absolute judicial immunity or quasi-judicial immunity has nothing to do with a federal court's jurisdiction. As Justice Scalia has put it, "[t]here is no authority whatever for the proposition that absolute- and qualified-immunity defenses pertain to the court's jurisdiction." *Nevada v. Hicks*, 533 U.S. 353, 373 (2001).

Instead, judicial immunity—like other forms of individual-based immunity such as absolute prosecutorial immunity or qualified immunity for public and law enforcement officials—is a merits-based limitation on the right of a plaintiff to proceed against a particular individual in their personal capacity. Moreover, it is a *common law* immunity. *See Pierson v. Ray*, 386 U.S. 547, 553-54 (1967); *see also Gross v. Rell*, 695 F.3d 211, 215 (2d Cir. 2012) (common law is source of quasi-judicial immunity). The common law does not divest federal courts of jurisdiction. The subject matter "jurisdiction" of the federal courts means "the courts' *statutory* or *constitutional* power to adjudicate the case." *United States v. Cotton*, 535 U.S. 625, 630 (2002) (emphasis added). There is nothing in Article III or elsewhere in the federal constitution that bars a federal court from hearing individual-capacity claims against federal or state court judges (or against those who carry out judges' orders). And there is no federal statute that strips the federal courts from hearing individual-capacity claims for money damages against judges or those who carry out judicial orders.[51]

---

[50] Doc. #168-1 at 12 n.7; *see also* Doc. #168-2 (Dreisbach affidavit).

[51] Congress has amended 42 U.S.C. § 1983 to state that "in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable." *Bliven v. Hunt*, 579 F.3d 204, 209 (2d Cir. 2009). But Wang does not seek injunctive relief and instead seeks money damages for actions that occurred long ago.

To be sure, there are good reasons to justify the doctrines of absolute judicial immunity and the derivative doctrine of quasi-judicial immunity. *See, e.g.*, *Mireles v. Waco*, 502 U.S. 9 (1991) (*per curiam*). But these reasons have nothing to do with whether a federal court has jurisdiction in the first place over individual-capacity lawsuits against judges and those who carry out judicial orders.

What is more, an *individual* immunity differs from an *institutional* immunity such as sovereign immunity which has constitutional separation-of-powers underpinnings for suits against the federal government and constitutional federalism underpinnings for suits against state governments including protection for the States from federal court lawsuits under the Eleventh Amendment. *See Cangemi v. United States*, 13 F.4th 115, 129 (2d Cir. 2021) (Rule 12(b)(1) governs motion to dismiss lawsuit against federal government on basis of sovereign immunity); *Morabito v. New York*, 803 F. App'x 463, 465 n.2 (2d Cir. 2020) (Rule 12(b)(1) governs motion to dismiss lawsuit against state government on basis of Eleventh Amendment and related principles of state sovereign immunity).

Thus, as then-Judge Ketanji Brown Jackson has explained, "[a]lthough the doctrines of absolute judicial immunity and sovereign immunity both lead to the same result, these two grounds for dismissal have different bases under the federal rules," because "[s]overeign immunity strips the court of jurisdiction and thus renders dismissal appropriate under Rule 12(b)(1)," while "[b]y contrast, absolute judicial immunity is a non-jurisdictional bar to a claim asserted against a federal judge stemming from official judicial acts and is thus subject to dismissal under Rule 12(b)(6) for failure to state a claim upon which relief can be granted." *Smith v. Scalia*, 44 F. Supp. 3d 28, 40 n.10 (D.D.C. 2014), *aff'd*, 2015 WL 13710107 (D.C. Cir. 2015).

Judge Bianco has likewise ruled that "[m]otions to dismiss on grounds of immunity from suit, including absolute judicial immunity, are properly analyzed under Rule 12(b)(6), rather than Rule 12(b)(1), of the Federal Rules of Civil Procedure." *Rios v. Third Precinct Bay Shore*, 2009 WL 2601303, at *1 (E.D.N.Y. 2009); *see also Morrison v. Walker*, 704 F. App'x 369, 372 n.5 (5th Cir. 2017) (same); *LaTulippe v. Harder*, 574 F. Supp. 3d 870, 879 (D. Or. 2021) (same).

Moreover, numerous federal appeals courts have ruled that a defendant who fails to timely raise a defense of judicial immunity has waived the defense. *See, e.g.*, *Reynaga Hernandez v. Skinner*, 969 F.3d 930, 937 n.1 (9th Cir. 2020); *Kelsey v. Withers*, 718 F. App'x 817, 821 (11th Cir. 2017); *Boyd v. Carroll*, 624 F.2d 730, 732-33 (5th Cir. 1980). But of course if the defendants are right that judicial immunity is a matter of federal subject matter jurisdiction under Rule 12(b)(1) rather than the merits of a claim under Rule 12(b)(6), then all these federal appeals court decisions have been wrongly decided because it is hornbook law that "[s]ubject-matter jurisdiction can never be waived or forfeited." *Gonzalez v. Thaler*, 565 U.S. 134, 141 (2012).

As a leading treatise recognizes, "[t]he defense of qualified or judicial immunity has also been held to be properly raised via Rule 12(b)(6) rather than Rule 12(b)(1), although one can find courts not being too particular about the distinction." 5B Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1350 (3d ed.). Alas, there are some outlier rulings which claim that a party may assert a judicial immunity or quasi-judicial immunity defense by way of a 12(b)(1) motion to dismiss. *See, e.g.*, *Cruzado v. Rogers*, 2022 WL 522955, at *1 (W.D. Wash. 2022); *Chien v. Motz*, 2019 WL 346761, at *6, *report and rec. adopted*, 2019 WL 346406, at *1 (E.D. Va. 2019); *Marshall v. New York State Pub. High Sch. Athletic Ass'n, Inc.*, 374 F. Supp. 3d 276, 287 (W.D.N.Y. 2019). But these rulings do not cite or acknowledge the

Supreme Court's decision in *Nevada v. Hicks* that there is no authority for the proposition that absolute or qualified immunity defenses go to a federal court's jurisdiction. And other than bold assertions that Rule 12(b)(1) governs motions to dismiss based on judicial immunity, they do not attempt to explain why that is or should be so.

So I conclude that Rule 12(b)(6)—not Rule 12(b)(1)—governs the defendants' claim that they are entitled to quasi-judicial immunity. Therefore, I decline at this time to consider Dr. Dreisbach's affidavit and rely instead on the allegations of Wang's complaint to evaluate the defense of quasi-judicial immunity.

As the defendants note in their briefing, courts recognize a "distinction between claims based on the actions actually authorized by court order, which are barred by quasi-judicial immunity, and those based on the manner in which a court order is enforced, which are not." *Russell v. Richardson*, 905 F.3d 239, 248 (3d Cir. 2018). "Court officers who enforce judicial orders are not entitled to absolute immunity if they exceed the scope of the court's order or enforce it in an improper manner." *DeVito v. Neiman*, 548 F. Supp. 3d 314, 319 (E.D.N.Y. 2021); *see also Schneider v. County of Will*, 366 F. App'x 683, 685 (7th Cir. 2010) ("We have . . . refused to extend quasi-judicial immunity to the *manner* a judge's order was executed."); *Bey ex rel. Palmgren v. Conte*, 2019 WL 1745672, at *4 (S.D.N.Y. 2019) (where the plaintiff is not "essentially challenging the judge's direction . . . rather than the manner [the defendants] executed the judge's order" then quasi-judicial immunity does not bar the suit); *Wright v. United States*, 162 F. Supp. 3d 118, 129 (E.D.N.Y. 2016) (a defense of immunity is not available where the plaintiff's claims arose out of the manner of carrying out a judge's order which itself made no mention of how it was to be effectuated).

As noted above, there was nothing in the state court's order authorizing the involuntary medication of Wang that authorized the defendants to forcibly administer Benadryl or to hold Wang for ten hours in four-point restraints. Instead, the defendants argue that these measures were "proper" to carry out the state court's order allowing them to administer Olanzapine and Ziprasidone. But even assuming that quasi-judicial immunity extends to acts that were "proper" in support of the state court's medication order, the facts as alleged in the complaint do not establish that the measures taken here were proper or necessary.

The defendants first contend that Wang's prolonged restraint was justified by the fact that he "continued to pose an imminent risk of physical harm to others," was "agitated and physically rigid," and "repeatedly threatened staff with violence."[52] But Wang disputes this account. While he concedes that he declined to affirmatively state to Dr. Kurlyandchik that he would not physically threaten anyone if he were taken out of restraints, he also insists that at no time did he pose a physical threat and explains that he did not want to make an affirmative statement because it would indicate that he had wanted to harm others in the past. Construing the facts in the light most favorable to Wang, he was not threatening or violent to justify placing him in four-point restraints for ten hours to administer various doses of medication.

The defendants further argue that Benadryl is often administered alongside antipsychotic drugs to diminish potential side effects.[53] But Wang alleges he was not experiencing any side effects from the antipsychotic medication when he received the first injection of Benadryl. This suggests that the first dose of Benadryl was not in fact necessary or proper to carry out the state court's medication order. The defendants also suggest that at least the second dose of Benadryl was also administered in part to sedate the plaintiff. But because the complaint states Wang was

---

[52] Doc. #168-1 at 13-14.
[53] *Id.* at 14.

16

not physically agitated and posed no violent threat to the defendants, this reason also cannot justify the forced injection, and Wang alleges that the Benadryl harmed him by causing him to fall after he was finally released from his four-point restraints.

In short, viewing the facts in the light most favorable to Wang and his complaint, the defendants have not established that they are entitled to quasi-judicial immunity. Accordingly, I will deny the defendants' motion to dismiss insofar as it is based on the defense of quasi-judicial immunity.

### *Qualified immunity*

Finally, the defendants move to dismiss pursuant to Rule 12(b)(6) on the ground that they are entitled to qualified immunity. They argue that they are entitled to a defense of qualified immunity because Wang has not alleged facts to show that they violated a clearly established federal right.

The doctrine of qualified immunity protects a government officer from liability for money damages stemming from a violation of the Constitution if the officer engaged in conduct that an objectively reasonable officer or official would not necessarily have known at the time amounted to a violation of the plaintiff's constitutional rights. *See Horn v. Stephenson*, 11 F.4th 163, 168-69 (2d Cir. 2021). Thus, in order for a plaintiff to overcome a defense of qualified immunity, the plaintiff must show that the defendants violated a right of the plaintiff that was clearly established law at the time of the conduct in question. *Ibid.*

Because it is sometimes difficult for an officer to understand how legal doctrine may apply to particular facts, a court must identify the right at issue with an appropriate level of specificity that is particularized to the facts of the case. *Ibid.* This is not to say that there must be a prior case involving identical facts or that is directly on point, so long as existing precedent

makes clear beyond reasonable debate that what the officer was doing was a violation of the plaintiff's then-recognized constitutional rights. *Ibid.*

In deciding whether the law was clearly established at the time of the alleged conduct, courts in the Second Circuit look to decisions of the U.S. Supreme Court as well as decisions of the Second Circuit, and they may also consider decisions from other federal circuit courts. *Ibid.* If these decisions either dictated or clearly foreshadowed a conclusion that the officer violated a plaintiff's constitutional rights, then this overcomes a defense of qualified immunity. *Ibid.*

The defense of qualified immunity may properly be raised at the pre-discovery, motion-to-dismiss stage because "[q]ualified immunity provides government officials 'immunity from suit rather than a mere defense to liability.'" *Looney v. Black*, 702 F.3d 701, 705 (2d Cir. 2012) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). Indeed, "[t]he driving force behind creation of the qualified immunity doctrine [is] a desire to ensure that insubstantial claims against government officials [will] be resolved prior to discovery." *Id.* at 706.

Yet when a defendant raises a defense of qualified immunity at the initial pleadings stage, a court must take care not to engage in a premature determination of the facts in a manner at odds with those facts that the plaintiff has pleaded in the complaint. The defendant presenting an immunity defense on a motion to dismiss "must therefore show not only that the facts supporting the defense appear on the face of the complaint, but also that it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Horn*, 11 F.4th at 170. "Moreover, the plaintiff is entitled to all reasonable inferences from the facts alleged, including those that defeat the immunity defense." *Ibid.*

As noted above, there are two basic aspects of Wang's claim: first, that he was wrongly subject to forcible administration of Benadryl and, second, that he was wrongly held in four-

point restraints for about ten hours. With respect to the medication claim, it was clearly established as of February 2017 that "[t]he forcible injection of medication into a nonconsenting person's body represents a substantial interference with that person's liberty" *United States v. Hardy*¸ 724 F.3d 280, 295 (2d Cir. 2013) (citing *Washington v. Harper*, 494 U.S. 210, 229 (1990)). A detainee "who has not been convicted of a crime has no lesser right" in "avoiding the unwanted administration" of medication. *Ibid.*

Wang alleges that he did not consent to either dose of Benadryl. Under the clearly established precedent set forth by both the Second Circuit and the Supreme Court, the forcible and unwanted injection of Benadryl outside the scope of the medication order violated his right to substantive due process of bodily integrity.

The defendants respond that neither the Supreme Court nor the Second Circuit have found that the right to avoid unwanted medication extends to "short-acting medications like Benadryl to prevent or mitigate the adverse effects of such drugs."[54] But viewing the facts in the light most favorable to Wang, there is no evidence that Benadryl is "short-acting" or that it was necessary "to prevent or mitigate the adverse effects" of the Zyprexa (Olanzipine) that he had received.

In any event, despite the absence of a particular case that has outlawed the involuntary administration of Benadryl without a court order, "officials can still be on notice that their conduct violates [clearly] established law even in novel factual circumstances." *Jones v. Treubig*, 963 F. 3d 214, 225 (2d Cir. 2020). And the Supreme Court has "expressly rejected a requirement that previous cases be fundamentally similar" to establish clear precedent for qualified immunity purposes. *See Hope v. Pelzer*, 536 U.S. 730, 731 (2002).

---

[54] *Id.* at 23.

Well before February 2017, the Second Circuit made clear that an individual's right to refuse unwanted medical treatment extends beyond antipsychotic drugs. *See, e.g.*, *Pabon v. Wright*, 459 F.3d 241, 249 (2d Cir. 2006) ("At the time of Pabon's Hepatitis C treatment [with Interferon drug], it was clearly established that the Fourteenth Amendment confers the right to refuse medical treatment."). There is no reason to suppose that any objectively reasonable medical professional would believe the right to refuse unwanted medical treatment in the form of forcible administration of medications is subject to an exception for over-the-counter drugs, short-acting drugs, or drugs that a doctor thinks appropriate for side effects but that are not wanted or consented to by the patient.

The defendants further claim that there was an "emergency" to justify the forcible administration of Benadryl. But again this is contrary to the allegations of the complaint, because Wang claims he was not acting threateningly or violently or suffering side effects for which the administration of Benadryl was warranted.

The defendants additionally argue that nurses Mejias and Hall should have qualified immunity because they were merely following Dr. Dreisbach's orders when they administered the two dosages of Benadryl. But both cases that the defendants cite ruled that the nurses were not liable because they were following instructions from a doctor that were "objectively reasonable." *Douglas v. Stanwick*, 93 F. Supp. 2d 320, 326 (W.D.N.Y. 2000); *see Roy v. Alicia*, 2021 WL 966010, at *6 (N.D.N.Y. 2021) (because the prescribing doctor was not liable for his involuntary medication order, then the nurse that injected the plaintiff pursuant to the doctor's orders also could not be liable). Viewing the facts in the light most favorable to Wang, I cannot conclude at this time that the doctor's decision to prescribe Benadryl against Wang's will and outside the dictates of the state court's medication order was "objectively reasonable." Moreover,

20

Wang alleges that nurse Mejias fabricated facts about his behavior that contributed to the decision to administer Benadryl and that nurse Hall relied on the need for the Benadryl to redress side effects that he was not experiencing.

As to Wang's separate claim arising from his extended time in four-point restraints, the Due Process Clause of the Fourteenth Amendment protects a pre-trial detainee from the use of excessive force that amounts to punishment, and from actions that are not rationally related to a legitimate nonpunitive government purpose or actions that are excessive in relation to that purpose. *See Kingsley v. Hendrickson*, 576 U.S. 389, 397-400 (2015); *Frost v. New York City Police Dept.*, 980 F.3d 231, 251-52 (2d Cir. 2020).

Wang was held in four-point restraints for about ten hours. He was released only when he requested to use the restroom shortly after midnight. He alleges that he was neither physically violent nor threatening harm during this time. To be sure, he was refusing and resisting the unwanted administration of Zyprexa (Olanzapine), but even so there is no reason to suppose that it was necessary to continue to hold Wang in 4-point restraints for hours to administer the second dose of Zyprexa (Olanzapine) rather than monitoring or detaining him in some other manner that did not cause him extraordinary pain. And to the extent he was further detained for the unwanted administration of Benadryl for which the defendants did not have a court order to administer to him, this makes the continued restraint all the more unreasonable. Wang insists as well that nurse Delciampo fabricated facts about his behavior that she used to recommend him remaining in four-point restraints. Viewing the facts in the light most favorable to the allegations of the complaint, an objectively reasonable medical professional in the defendants' position would have known that it violated Wang's constitutional right to be free from the use of excessive force by

maintaining him in four-point restraints for approximately ten hours despite any genuine need to do so.

In *Hope v. Pelzer*, 536 U.S. at 738, the Supreme Court held it was a clear violation of the Eighth Amendment prohibition against wanton and unnecessary pain to handcuff an inmate to a hitching post for seven hours, where he was exposed to the sun and deprived of a bathroom break. Other circuits have also found that subjecting an inmate who is not "violent, combative, or self-destructive at any point" to mechanical restraint in a four-point restraint chair for prolonged periods of time can be a violation of the prohibition against excessive force. *See Young v. Martin*, 801 F.3d 172, 181-82 (3d Cir. 2015) (Eighth Amendment violation where inmate was restrained without reason for fourteen hours); *Barker v. Goodrich*, 649 F.3d 428, 434-35 (6th Cir. 2011) (denying qualified immunity where sentenced inmate was handcuffed and placed in a detention cell for twelve hours, during which time he missed a meal, was unable to sit or lie down, use the restroom, or get water from the fountain). That Wang was not a sentenced prisoner but a pre-trial detainee at the time of the incident makes his prolonged restraint all the more problematic. *See also Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017) ("Pretrial detainees have not been convicted of a crime and thus may not be punished in any manner—neither cruelly and unusually nor otherwise.").

The defendants argue that their decision to keep Wang restrained is entitled to deference as a "presumptively valid" decision made by a professional.[55] But for all the reasons above and on the facts as alleged, Wang's prolonged restraint was a "substantial departure from accepted professional judgment" such that the decision does not merit deference at this time. *See Youngberg v. Romeo*, 457 U.S. 307, 321 (1982).

---

[55] *Id.* at 19-20.

The standard set in *Hope*, along with the precedent set by other circuits, clearly established at the time of the conduct in question that subjecting an inmate—let alone a pretrial detainee—to mechanical restraints for ten hours constitutes excessive and unreasonable force absent a demonstrated need to do so. Accordingly, I conclude that the defendants are not entitled to qualified immunity at this time as to Wang's claims for the forcible administration of Benadryl and the prolonged use of four-point restraints.

CONCLUSION

For the reasons stated above, the Court DENIES the defendants' motion to dismiss (Doc. #168) and DENIES as moot the plaintiff's motion in opposition to the defendants' motion to dismiss (Doc. #184).

It is so ordered.

Dated at New Haven this 24th day of March 2023.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge